## LOUIS STRACK and ROSA STRACK v. MISSOURI and KANSAS TELEPHONE COMPANY and METROPOLITAN STREET RAILWAY COMPANY, Appellants.

### Division One, February 25, 1909.

1. **NEGLIGENCE: Stringing Wires: Regulation: By Contract.** City authorities may require a telephone company to which it grants the privilege of erecting poles in a public street, to allow other concerns to string its public utility wires on the poles, and that which a concern may be required to do it may do by contract.

2. ————: ————: **Public Convenience: Discontinued.** The stringing of wires in a public street, even for telephone purposes, is liable to cause some inconvenience or possible danger, and it is allowed only on the theory that it contributes to the public convenience; and so, when the public use of the wire has been discontinued there is no excuse for permitting it to remain, and to the extent that it is perceptibly an inconvenience or danger the maintaining of it is negligence.

3. ————: ————: **Consequences.** The liability of a telephone company for negligence from a wire which a private company has strung along its poles and which is no longer used, is to be measured by the consequences that could reasonably have been anticipated to follow from the negligent act of permitting it to remain on the poles after its public use was discontinued.

4. ————: ————: ————: **Anticipated Danger: Storm.** A brewing company constructed a street railway, and on its trolley poles strung a telephone wire about the size of a knitting needle, parallel with the trolley wire and about fifteen feet from it, and that wire was connected with defendant telephone company. The railway passed into the hands of de-

fendant railway company, and the brewery, having at the first made connections with the defendant telephone company, then ceased to use its small wire, and it was disconnected, but was allowed to remain on the poles. *Held*, that conceding it was negligence to permit the wire to so remain after its public use had been discontinued, no one could reasonably be expected to anticipate that a violent storm would come and break a piece out of it, throw the pieces across the live uninsulated trolley wire fifteen feet away, leaving one end hanging down so low that a little child passing next morning was touched by it and instantly killed. Until the storm came there was no negligence on the part of either company.

5. ————: **Loose Telephone Wire: Notice.** The small disused wire was not a part of the telephone system, but having been strung on the railway trolley poles was permitted to remain there after it had ceased to be used, and was disconnected with the telephones. A severe storm between five and six o'clock broke a piece out of the wire, threw the piece across a live trolley wire fifteen feet away, and one end hung down but not low enough to touch passing cars, and the other to the ground near the pole, and the next morning about six o'clock a five-year-old child passing in some way touched the end near the pole, and was killed. A young lady testified that before the wire broke it did not sag, but that one end of the piece hung down by the pole, and the other blew over the trolley wire and hung down but not to the passing cars. She made no report to the company. Two men testified that they saw a wire that "just sagged down" and telephoned to the office or girl that a wire was "loose" or "down," and the answer was that it would be attended to. *Held*, there was no actual notice. The men telephoned what they saw, and that was that the wire sagged, and that indicated no danger, and what the lady saw she did not report.

6. ————: ————: ————: **To Telephone Girl.** One witness did not remember what number or whom he called up, and the other said he called up the number he usually called when he wished to make complaints to the telephone company, but whom he reached by that call he did not know. *Held*, not sufficient to show notice to the company. Notice given to someone without knowing to whom it is given is no evidence that it reached the company for whom intended.

7. ————: ————: ————: **To Railroad Company.** By the freak of the storm a copper telephone wire of the size of a knitting needle was broken in two places and the piece thrown across a live trolley wire, and one end hung down but not so as to touch passing cars. *Held*, not to be notice of the situation to the railway company, whose cars passed from the time it happened late in the afternoon until six o'clock next morning,

and there was nothing in the facts to require the company to discover it by inspection, or to authorize the jury to determine that the company knew or by the exercise of ordinary care might have known the danger, from the other end which hung down to the ground near the trolley pole, to a small child who, passing across the street, was killed by the heavily charged wire.

Appeal from Jackson Circuit Court.—*Hon. John G. Park*, Judge.

REVERSED.

*Harkless, Crysler & Histed* for appellant Missouri and Kansas Telephone Company.

(1) The court erred in submitting to the jury the issue of actual knowledge by the Telephone Company of the existence of the break in the wire, which issue was wholly unsupported by proof. Wojtylak v. Coal Co., 188 Mo. 260; American Storage Co. v. Railroad, 120 Mo. App. 410; Chambers v. Railroad, 111 Mo. App. 609; Ward v. Transfer & Storage Co., 119 Mo. App. 83. (2) It appearing in the evidence that the wire was disconnected and therefore carrying no current and that it formed no part of the system of the defendant telephone company, the rules of duty which obtain in the case of a live wire forming a part of the telephone system do not apply. (3) It appearing that this wire was out of use and remote from contact with the trolley wire and was securely and safely attached to the pole until at least 5:30 o'clock p. m. on the day before, negligence cannot be ascribed to the telephone company in failing to inspect and provide against the accidental breaking of said wire, by reason of the severe and vehement wind storm and the subsequent connection of the wire with the trolley wire. Fuchs v. St. Louis, 167 Mo. 620; Chandler v. Gas Co., 174 Mo. 329; Beasley v. Transfer Co., 148 Mo. 413. (4) The defendant Telephone Company had a reasonable time

after the telephone wire came in contact with the trolley wire within which to remove the same. Lamport v. Laclede Gas & Light Co., 14 Mo. App. 393; Dodge v. Manufacturers Coal & Coke Co., 115 Mo. App. 501; Abbott v. Mining Co., 112 Mo. App. 550. (5) The court erred in holding that the jury might determine from the evidence that the wire had remained in a broken condition for such length of time that the defendant telephone company should have known of its condition.

*John H. Lucas, Ben T. Hardin* and *C. S. Palmer* for appellant Metropolitan Street Railway Company.

The peremptory instruction in favor of this defendant should have been given. American Brewing Association v. Talbot, 141 Mo. 683; Fuchs v. St. Louis, 167 Mo. 645; Webb's Pollock on Torts (Enlarged Am. Ed.), 45, 46; Bishop on Non Contract Law, sec. 437; Goodrich v. Railroad, 152 Mo. 222.

*P. E. Hatch* and *Reed, Yates, Mastin & Harvey* for respondent.

(1) The court committed no error in submitting to the jury the issue of actual knowledge by the Telephone Company of the existence of the break in the wire. Such issue was supported by substantial evidence. Where there is any substantial evidence, however slight, in support of an issue, it is the duty of the court to submit such issue to the jury. McManus v. Railroad, 118 Mo. App. 161; Knapp v. Hanley, 108 Mo. App. 353; May v. Crawford, 150 Mo. 504; Baird v. Railroad, 146 Mo. 265; Holloway v. Tel. Co., 195 Mo. 265; Cannon v. Gas Co., 145 Mo. 513. (2) It appearing from the evidence that the wire in question, after the telephone which it connected was taken out and no further use remained for the wire, was left hanging on the poles of the Metropolitan Street Railway Com-

pany, above and in proximity to the trolley wires of the railway company, carrying a heavy current of electricity, and that the wire in question was uninsulated, the defendant Telephone Company would be governed by rules of duty equally as strict as those applying to a live telephone wire not hanging in such dangerous proximity. Tel. and Tel. Co. v. McTyer, 34 So. 1020, 137 Ala. 601; Thompson on Electricity, sec. 78; U. S. Electric Co. v. Shelton (Tenn.), 14 S. W. 863; Gerandi v. Elect. Imp. Co., 107 Cal. 120; Geismann v. Mo. Edison Light Co., 173 Mo. 654; Gannon v. Laclede Co., 145 Mo. 502. (3) It appearing from the evidence that the wire in question was so hung that an ordinary storm might blow it over the trolley wires, that it was put up in 1900, that there was no earthly use for it on the poles after the telephone to which it led was no longer in use had been taken out; that this wire was seen to be down, somewhere between 4:30 and 5:30 p. m. of the afternoon by several persons; that it was on a much-traveled street; that it blew down and across the trolley wires in a storm that was not extraordinary or unusual; the Telephone Company can certainly be charged with negligence, under all the circumstances in the case. Gannon v. Gas Co., 145 Mo. 535; Dean v. Railroad, 199 Mo. 408; McMahon v. Express Co., 132 Mo. 641; Woods v. Railroad, 188 Mo. 229; Hovarka v. Railroad, 191 Mo. 441; Wencker v. Railroad, 169 Mo. 592. (4) There was no error committed by the trial court in submitting to jury the question of whether or not the defendant Telephone Company could have, by the exercise of ordinary care, discovered the position and condition of said wire, a sufficient length of time before the injuries, under all the circumstances in the case, and removed said wire. What is a reasonable time depends upon the circumstances of each case. Klockenbrink v. Railroad, 172 Mo. 678; Hiller v. Town of Canton, 112 Mo. App. 322;

Goodman v. Kahoka, 100 Mo. App. 278; Young v. Webb City, 150 Mo. 333; McKissick v. St. Louis, 154 Mo. 588; Beauvais v. St. Louis, 169 Mo. 500; Carrington v. St. Louis, 89 Mo. 208. (5) The court committed no error in refusing the request of the Telephone Company for a verdict in its favor; on the contrary it would have been a grievous error against plaintiffs if it had granted such a request. Where there is substantial evidence on an issue, that issue must be submitted to the jury. Knapp v. Hanley, 108 Mo. App. 353; McManus v. Railroad, 118 Mo. App. 161; May v. Crawford, 150 Mo. 504; Baird v. Railroad, 146 Mo. 265; Hollweg v. Tel. Co., 195 Mo. 149; Cleary v. Railroad, 108 Mo. App. 433. (6) The appellate court will not pass upon the weight of the evidence in an action at law where there is any substantial evidence to sustain the verdict. McManus v. Railroad, 102 Mo. App. 211; Blanton v. Dold, 109 Mo. 64; State v. Jacobs, 152 Mo. 565; Hovarka v. Railroad, 191 Mo. 452; Nephler v. Woodward, 200 Mo. 179. (7) The demurrer of the Metropolitan Street Railway Company was properly overruled. Its liability does not depend on its ownership of the wire. Daltry v. Media Elec. Light Co., 208 Pa. St. 403; Hebert v. Lake Charles Ice & L. Co., 111 La. Ann. 522. Nor was the storm sufficiently unusual to prevent the submission of the question of negligence to the jury. Hebert v. Lake Charles, etc., Co., supra.

VALLIANT, J.—Plaintiffs are the father and mother of a five-year-old child that was killed on the 25th day of June, 1904, by coming in contact with a wire highly charged with electricity hanging down from a pole in a public street in Kansas City. This suit is brought under sections 2865 and 2866, Revised Statutes 1899, the petition alleging that the accident occurred because of the negligence of the two defendants.

As indicated by their names respectively, one of the defendants is a telephone company, the other a street railroad company, each maintaining wires in the public streets charged with electricity. In the wires of the one the electric current is comparatively mild and harmless, being about fifty volts; in those of the other it is necessarily strong and more dangerous, being about five hundred volts.

The street railroad, or that portion of it to which our attention is drawn, is a double track, extending from Guinotte avenue on the south along Montgall avenue north to Nicholson avenue. This road was built in 1900 by the Heim Brothers who at that time owned a brewery on Guinotte avenue. The power house of the railroad was located at the corner of Nicholson and Montgall avenues. The railroad was built, owned and operated by a corporation called the East Side Electric Railway Company, and the brewery by a corporation called the Ferd Heim Brewery Company, but they were both really the property of the two Heim Brothers. The Heim Brothers then owning and operating both the brewery and the railroad, contracted with the Telephone Company for telephone connection between the brewery and the power house. This was accomplished by the Telephone Company stringing wires along its own poles from the brewery to Montgall avenue, and thence to the power house along the trolley poles of the railroad company parallel with the trolley wires and installing the telephone in the power house. At that time the brewery company had a private telephone exchange in the office of the brewery, and the installation of the telephones in the power house put it in connection with the brewery office.

The defendant, the Metropolitan Street Railway Company, bought this railroad of the Heim Brothers in July, 1901, and the telephone was continued in use until July, 1903, when it was disconnected and taken

out, but the wires were allowed to remain strung on the trolley poles until this accident occurred, July 25, 1904. These wires were not embraced in the Telephone Company's system of wires, they were used only to connect the brewery office and the power house, and when the disconnection was made in July, 1903, no use of them was made for any purpose, they were just left where they were and no notice taken of them. They were not insulated, they were naked wires about the size of a knitting needle. These telephone wires were not strung above the trolley wires, in such position that if they should break they would naturally fall down on the trolley wires, but were strung parallel with and about fifteen feet from them.

Late in the afternoon of July 24, 1904, a severe wind storm passed over that part of the city and by its force one of these telephone wires was broken in two places and the broken piece was thrown across the trolley wires. One end of it, as it lay across the trolley wires, hung down, but not far enough to touch a person on the ground; the other end came down to or near the ground and the wire being naked and coming in contact with the trolley wires became heavily charged with electricity. On the next morning about six o'clock the plaintiffs sent their five-year-old child on an errand which led him along Montgall avenue, and a few minutes later the child was found lying dead near the trolley pole, his body in contact with the wire.

So far the facts are undisputed. What dispute there may be relates to the question of notice to the defendants of the dangerous condition of the wire after the storm had broken it and blown it across the trolley wires. We will consider the evidence on that subject hereinafter. The case was given to the jury on instructions that authorized a verdict against the Telephone Company if they should find that the telephone wire belonged to the Telephone Company and that the Telephone Company knew the condition of the

wire at the time of the accident, or if the condition had continued long enough for the Telephone Company, by the exercise of ordinary care, to have discovered it a sufficient length of time before the accident to have removed it.

An instruction authorized a verdict against the railroad company if it knew the condition or by the exercise of ordinary care would have known it a sufficient length of time before the accident to remove the wire.

There was a verdict against both defendants for $5,000 and each defendant took an appeal.

I.  There is nothing to indicate negligence on the part of either of the defendants in the matter of the stringing of the telephone wires on the poles of the railroad company or installing the telephonic connection between the brewery and the power house.  City authorities often require a corporation to whom it grants the privilege of erecting poles in the street to allow other concerns to string its public utility wires on the poles, and that is not an unusual regulation, and in this particular that which a concern may be required to do it may do by agreement.  Nevertheless the stringing of wires in a public street even for telephone purposes is liable to cause some inconvenience or possible danger and it is allowed only on the idea that it contributes to the public convenience. When, however, the public use of the wire has been discontinued there is no excuse for allowing it to remain, and therefore to the extent that it is perceptibly an inconvenience or danger the maintaining of it is negligence.  But the liability for such negligence is measured by the consequence that could reasonably be anticipated to follow from the negligent act.  The law on this point is well stated in Am. Brewing Association v. Talbot, 141 Mo. 674, l. c. 683-4.  Conceding, therefore, that it was an

Strack v. Telephone Co.

act of negligence to leave these wires strung on the trolley poles after they had ceased to be used for telephone purposes, the question arises, what injurious consequence could be reasonably anticipated from the act? If before this accident one had gone to the chief of the street department of the city government and complained of these wires and demanded that they be removed, what could he have suggested as the probable or even possible danger he apprehended? Now, that the storm has come and broken a piece out of one of the wires and blown one end of the piece across the trolley wires, the other end falling near the ground heavily charged, by its accidental contact with the trolley wires, with electricity, it is clear that the situation was susceptible of being the means of a possible danger, but who could have anticipated that? If the law were so unreasonable as to hold people liable for the results of their acts however remote from natural sequence they might be, it would convert every one into an insurer against possible consequences of his acts however inoffensive the acts might appear at the time they were committed. We hold therefore that until the storm came and converted the situation into one of danger there was no negligence on the part of either of these defendants, and if there was negligence afterwards it was, as indicated in the instructions, that the defendants knew it or should have known it and failed to remove it after having reasonable opportunity to do so.

II. On the question of the ownership of the wire by the Telephone Company we think there was sufficient evidence to authorize the submission of it to the jury.

But the serious question is, did the Telephone Company have any notice of this condition in time to have removed the wire before the accident?

As already said, these wires were not a part of the Telephone Company's system of wires, they were disconnected from electric touch and were not in service at all, therefore a break in one of them would not be discovered in the ordinary course of business. The storm occurred late in the afternoon between five and six o'clock after the ordinary working day was over, the accident occurred the next morning about six o'clock.

There is some discrepancy between the plaintiffs' witnesses as to the exact time when the wire was broken, but neither of them professed to be very exact and the discrepancy in that particular is not very material. There is a discrepancy, however, on another point that is more important. A young lady was the only witness who was looking at the wire when it broke. She was standing on the porch of her house. She testified: "Well, late in the afternoon, about half past five or six, I noticed the wire break. . . . I was on the front porch, and the wire broke on the post opposite our house, and one end of it hung down by the pole and the other end the wind blew over the trolley wire, and it hung down. There was room enough for the cars to pass under it." She said the cars continued to run there all the evening. She was looking at the wires when this one broke, before it broke it was strung from pole to pole and was almost straight, there is always a little sagging between the poles; this wire was in the ordinary shape in that particular.

Another witness was standing at the entrance to Electric Park, he thought it was between four and five o'clock—nearer five; he saw the wire sagging between the poles so low that he judged from where he stood he could almost have touched it with his hand, the sagging was caused by the wind storm, the wire was not broken, he did not see either end, he only saw the sagging and he told a man in his employ to go

to the telephone and report it to the Telephone Company, the man walked off in the direction of the telephone; about six o'clock as witness was going home he again noticed the wire, it was in the same condition, and when he got home he called up the telephone number which he understood was the office of the Telephone Company and told the person who answered the call "that their wire was loose across from the entrance of the park and ought to be fixed at once, they said they would attend to it." The number the witness called up was the one he had frequently called when he had a complaint to make to the office. This witness did not know that the wire was disconnected and not in use.

The man who was ordered by the last witness to go to the telephone and report the condition to the company testified that he was with the last witness when he observed the wire and he saw it at the same time, one end hanging down and curled at the end, that when ordered to go to the telephone and report it he went, that he called up a number, he was not sure what, he said: "If I remember—I am not sure—I think I asked for 600, but I don't remember if I did that or told it straight to the telephone girl. . . . They said, 'All right.' . . . I told them the telephone wire was down. . . . Q. All you know is you telephoned to somebody and somebody said this thing to you? A. That is all." After first stating that he saw the wire, one end hanging down and curled at the end, he stated that the wire was not broken when he saw it, but "just sagged down; that is all I noticed of it."

Those last two witnesses afford all the evidence there is in the case of notice to the Telephone Company that the wire was down. The testimony of the defendant Telephone Company is to the effect that they had no notice of it at all. But we will consider the case on the plaintiffs' evidence alone on the re-

fusal of the court to give an instruction asked by
the Telephone Company at the close of the plaintiffs'
evidence to the effect that plaintiffs were not entitled
to recover.

Of these two witnesses the first was the more in-
telligent and reliable. He did not know that it was
a disconnected and disused wire; he saw no break
in the wire, he only saw that it sagged. If that is
what he saw and if that is what he reported, then he
did not see or report that which the young lady saw
and which was the cause of the accident. Assuming
that this witness and the young lady were both honest
and intelligent, that they knew what they were talk-
ing about and were telling the truth, it is impossible
to conclude that they both saw and both were attempt-
ing to describe the same thing. The young lady said
she was looking at the wire, that it was straight from
pole to pole, no sagging except the slight sag that
is seen in all wires so strung, that she saw it break by
the force of the wind, one end of the piece broken out
was thrown by the wind over the trolley wires, while
the other dropped down close to the pole with the
end near the ground; she also said that the end of
that part which was thrown over the trolley wires
hung down but not low enough to touch the cars that
passed. The other witness said there was no break
in the wire, there was only a sagging between the
poles, and that is what he reported or attempted to
report to the Telephone Company. The other man
who said he gave the information straight to the
telephone girl, first said that the wire was broken
and one part hanging down curled at the end, but
afterwards said that he noticed no break at all, it
only sagged. These two men were standing together
and what one saw the other saw. Neither saw the wire
broken with one end across the trolley wires and the
other hanging down, and therefore neither reported
such fact to the company; the only thing they claim

to have reported is what they saw, that is, that the wire was loose or sagging. Suppose the Telephone Company received that notice, what danger did it suggest? They knew what the witness did not know, that is, that it was a dead wire; if it fell by its own weight it would fall to the ground and hurt no one who might come in contact with it, it was fifteen feet west of the west trolley wire and therefore not at all likely in falling to come in contact with it. Can it with any degree of reason be said that from such notice the Telephone Company could know or suspect the dangerous condition into which by a freak of the storm this wire had been placed? No one pretended to give them notice of such a condition and there was nothing to cause them to apprehend or suspect such a condition.

We are also of the opinion that what was said by the two witnesses concerning their efforts to communicate with the Telephone Company was not sufficient to show that they communicated with the company at all. One of them did not remember what number or whom he called, the other said he called up the number which he usually called when he wished to make complaints to the Telephone Company, but whom he reached by that call he did not know. It would be mere conjecture on the part of the jury if they should say on such evidence that the defendant had notice of the situation. We are not saying or implying that notice in such case might not be given by telephone, but notice given to some one without knowing to whom it is and no evidence that it reached the person or concern for whom the notice was intended, is no notice at all.

We hold that the instruction asked by the defendant Telephone Company to the effect that the plaintiffs were not entitled to recover should have been given.

III.  As to the railroad company there was no attempt to prove that it had any notice of the situation.  The only fact from which it is attempted to draw an inference of knowledge is that the cars continued to run there all the while.  But there was no evidence on the part of the plaintiffs tending to show that the condition of the wires, as described by the young lady, was such as to obstruct or hinder the running of the cars or that it was of consequence sufficient to attract the attention of a motorman or conductor.  We are not now talking about a sagging wire not broken, because if there was a sagging wire it has done no harm, no one is here complaining of an injury caused by a wire that sagged, but the complaint is of a broken wire thrown across the trolley wires with both its ends in sight and hanging down.  The wire, according to the young lady, did not hang down low enough to touch a car.  The cars continued to run there all the evening and owl cars at longer intervals during the night; yet nothing in the way of a hinderance or obstruction was observed.  There was no suggestion that anything was wrong with the trolley wires, therefore there was nothing to call the attention of the railroad people to the situation.  On cross-examination of one of defendants' witnesses the plaintiffs brought out the fact that an obstruction on the trolley wire was liable to throw the trolley off or cause "an arc" or sparks to flash, but no one saw any such manifestation.  If we consider what kind of a wire this was, a small copper wire the size of a knitting needle, thrown over the trolley wire, we ought not to require any expert testimony to know that its effect on the trolley as the car passed under it would be almost imperceptible, possibly a little flash and nothing more.  No witness testified that a small wire like that thrown over the trolley wire would have caused such an explosion or interruption of the passing of the car when the trolley passed under it as to have attracted attention and

if any witness had so testified no one would have believed him. Men have a right to use their common sense in trying law suits as well as in their everyday business.

This breaking of the wire by the wind occurred, according to plaintiffs' witnesses, late in the afternoon, half past five or six o'clock, the working day was over, there was nothing in the way of an interruption of the railroad traffic to call the railroad people's attention to the situation, how then can it be said that the railroad company was at fault in not sending inspectors over their line during the night? Conceding that it is their duty to use ordinary care to inspect their lines, yet can we say that the circumstances of this case are such as to raise a question of fact as to whether or not the railroad company used ordinary care to inspect its lines? If so then such a question may be submitted to the jury in any case. We see nothing in the evidence to justify the submission of the question of whether or not the railroad company knew or by the exercise of ordinary care would have known the dangerous condition of these wires. Therefore the instruction asked by the railroad company in the nature of a demurrer to the evidence ought to have been given.

There is another question discussed in the briefs relating to the instruction given at the request of the plaintiffs on the measure of damages, but in view of what we have above said on the merits of the case there is no occasion to consider that question. The judgment is reversed.

All concur.