GERTRUDE GOODWIN, Respondent, v. COLUMBIA TELEPHONE COMPANY, Appellant.

Kansas City Court of Appeals, June 12, 1911.

1. **TELEGRAPHS AND TELEPHONES: Wrongful Death: Evidence: Opposed to Physical Facts.** In an action brought by a widow, under the provisions of section 5426, R. S. 1909, to recover damages for the death of her husband caused by the negligence of defendant telephone company, in leaving exposed and within reach a wire carrying a high voltage current, the question was whether plaintiff's evidence, touching the height of the wire, was opposed to plain and indisputable physical facts. *Held*, that physical facts cannot be allowed to utterly destroy the testimony of witnesses, except where such testimony is so inconsistent with them that no reasonable mind would believe it.

2. ————: ————: **Negligence: Proximate Cause.** Where plaintiff's petition for damages for the wrongful death of her husband was founded on the omission of defendant to observe ordinary care, and where defendant failed to protect its non-insulated low voltage wire from the high-voltage electric light wires whose currents it knew existed, and allowed its charged wire to sag for twelve days within easy reach of passersby, the proximate cause of the injury was not the act of deceased in grasping the wire, but was the negligent failure of the defendant to observe ordinary care.

3. ————: ————: **Notice: Servant Off Duty.** To prove that defendant had actual notice of the fact that the wire which caused the injury was too low and was carrying a high current, a witness, who had also suffered a slight shock, was allowed to testify that he had told one of defendant's linemen of this incident at the latter's house one Sunday when the lineman was not on duty. Plaintiff failed to show that the lineman was in control of the line where the injury occurred, that he had any authority to do repair work, or that he was under any duty to report "trouble" of which he received information while

off duty. *Held,* knowledge that comes to an agent of a corporation while he is not in the performance of his duties as such agent is not notice to the corporation, and where knowledge of a fact in which a corporation is interested is imparted to a mere servant, his authority to bind the corporation by such knowledge must be shown, and will not be implied. Hence, the admission of this evidence to show actual knowledge was prejudicial error.

Appeal from the Boone Circuit Court.—*Hon. N. D. Thurmond,* Judge.

REVERSED AND REMANDED.

*E. W. Hinton* and *McBaine & Clark* for appellant.

*Charles M. Hay* and *Harris & Finley* for respondent.

JOHNSON, J.—Plaintiff, the widow of James W. Goodwin, deceased, is prosecuting this action under section 5426, Revised Statutes 1909, to recover damages for the death of her husband which, she alleges, was caused by the negligence of defendant. The answer is a general denial and a plea of contributory negligence. The cause is here on the appeal of defendant from a judgment of $6000 recovered by plaintiff at the end of a trial to a jury. The injury which caused the death of Goodwin occurred between 6:30 and 7:00 o'clock in the evening of July 29, 1910, on Fifth street in the city of Columbia. This street runs north from Broadway and, in the order named, crosses Walnut, Ash and Park avenue, east and west streets. A granitoid sidewalk four feet wide is on the west side of Fifth street and at a place south of Ash street the sidewalk runs under the overhanging branches of a large locust tree, the trunk of which is on a low terrace just west of the sidewalk. Defendant operated a telephone exchange in the city and maintained a line on Fifth street consisting of poles, cross arms and eight wires, the poles being planted on a line just east

of the east line of the sidewalk mentioned. One of these wires (the cause of Goodwin's death) swung about eighteen inches east of the sidewalk at a height variously estimated by the witnesses. The line was in poor repair and for some time the wires, including the one under special consideration, were slack and swung low at the place where they passed through the overhanging foliage of the tree. Early in the morning of Sunday, July 17, 1910, twelve days before the death of Goodwin, a severe wind storm broke some of the limbs of the tree in a manner to cause them to press the wire in question down to a height of about six feet and hold it there. Soon after some of the lower branches were removed but the wire continued to be held down by other branches of the broken limbs and a number of witnesses introduced by plaintiff say that the height of the wire above the sidewalk until the death of Goodwin was between six and seven feet.

Witnesses for defendant testify that the wire was over eight feet high and since defendant contends that the evidence of plaintiff relating to this fact must be ignored as contrary to the plain and undisputed physical facts of the situation, we shall briefly review this evidence after completing the history of the death of the unfortunate man. At Park avenue, the second street north of the tree, the telephone line crossed a line of electric light wires maintained by the city. These wires carried high power currents of electricity and were insulated. Defendant's telephone wires carried low currents and were uninsulated. The wire in controversy at the crossing had been run between the electric light wires and there is substantial evidence tending to show that on July 17, 1910, and thence on to the death of Goodwin, it had come into contact with one of the light wires, had worn off its insulation and, consequently, was in place and condition to make a short circuit of the powerful current carried by the light wire.

Goodwin, his wife and small child and a young woman were returning home from a visit to the "county fair." They walked south on the sidewalk on the west side of Fifth street and Goodwin, who was thirty years old, and the young woman were in a playful mood. He "tagged" her on the arm, she ran on to the sloping terrace, he started to follow but turned back to the sidewalk and reached up to push aside the depending foliage, or to pluck some leaves. His hand grasped the telephone wire running through the foliage and his body formed a short circuit for the deadly current drawn by the telephone wire from the electric light wire at the crossing on Park avenue. He was a large, vigorous man and struggled with death a brief moment. Witnesses say he fought the wire and, as they describe the scene, the wire seemed a sentient enemy of overpowering strength which, despite his struggles, slowly drew him to its embrace. At some time the wire broke. One witness said the wire "seemed sticky" and that Goodwin vainly tried to push it away. Once he sank down but arose still fighting, then sank again, never to arise.

In line with the contention of defendant that the wire was over eight feet high its evidence tends to show that Goodwin followed the young woman on to the terrace and then, turning playfully, jumped and tried to catch the foliage but, instead, caught the wire. The inference might be drawn from some of the evidence that the young man intentionally caught the wire but nearly all of the witnesses, including some introduced by defendant, say they thought he was trying to catch at the leaves or branches of the tree and in the consideration of the demurrer to the evidence we shall assume that such was his purpose and that he had no thought that a deadly enemy lay concealed in the foliage. And further, should we find that the evidence of plaintiff touching the height of the wire is not opposed to plain and indisputable physical facts we

would be justified, under the rule that requires us to take the most favorable view of the evidence of plaintiff, in passing on the demurrer to the evidence, in assuming that Goodwin did not jump at all, but, standing on the sidewalk, merely reached up his hand to brush away the hanging foliage or, perhaps, to pluck some leaves. The contention of counsel for defendant relative to the height of the wire is based on the fact that at the places where the wire was held down by the broken branches the bark was rubbed off, and that these abrasions were over eight feet above the sidewalk by actual and accurate measurement made after the event.

The evidence of plaintiff relative to the height of the wire and the existence of the short circuit even as far back as July 17, is as follows: J. F. McCowan testified that in going along the sidewalk the afternoon of the day of the storm he observed that the wire was being held down by the branches and was not over six feet high; that it was low enough to strike him on the head and that he tried to take off one of the limbs and accidentally came in contact with the wire, receiving a severe shock. Witness then followed the wire back to Park avenue and saw that it rested on an electric light wire at the crossing and had worn a groove in the insulation. Further he testified:

"Q. Did you notice the height of the wire, from the sidewalk, on the day that Mr. Goodwin was killed? A. It was about—the limb that held the wire down right under the tree, it was about six foot high there, and after that the limb was taken off and the wire sagged back south and it was lower back south than under the tree.

"Q. Back south five, or ten or fifteen feet south of the place where the limb had rested upon the wire, how high was the wire from the sidewalk? A. It was not over six feet high.

"Q. Was that condition on the day that Mr. Goodwin was killed? A. I never noticed it just the day

he got killed, but it was the day before he got killed.''

J. W. Woods testified that on the day of the storm he pushed a limb off of the wire with a pitchfork and received a severe shock. We quote from his testimony:

"Q. At that time, how high was the wire from the ground? A. At the time I took the limb off of it, it was between five and six feet high.

"Q. After you took the limb off, how high was it, say, under the tree and south of the tree? A. At the time the limb was on this, it was lowest right there, but when I lifted the limb off the wire sagged back south about the same height.

"Q. Between five and six feet? A. Yes, sir, and south of where I took it off.

"Q. Did you observe the condition of this wire after that time? A. Well, the wire sagged down there several days afterwards.

"Q. Did you notice it off and on, or not up to the time of Mr. Goodwin's death? A. No, I did for several days but during fair week I had a right smart to do, to take care of horses in the barn and run the wood yard and didn't pay no particular attention to it.

"Q. State whether or not the last time you noticed it it was in the same condition as you have described it. A. Yes, sir.''

Tarleton Woods testified:

"Q. How long had it been before he was killed since you noticed the condition of this wire? A. It had not been half an hour.

"Q. What was the condition of the wire at that time? A. It was tolerably low down, then.

"Q. About how high? A. A man of my height, it would have struck him along about the face and ear.

"Q. How tall are you? A. Six feet and three inches.''

Mattie Hall who lived in sight of the place tes-
tified:

"Q. How high would you say the wire was from
the sidewalk? A. I am not positive as to the distance
but any ordinary person could have touched it if they
had reached their hand.

"Q. Did you notice where the wire ran through
the limbs of the tree? A. I didn't know whether it
was running through or not but I noticed that it was
on the limb and low.

"Q. Did you notice the condition of it on the day
Mr. Goodwin was killed? A. Yes, sir.

"Q. With respect to the condition you have just
described, how was it? A. It was just about the same.
It had been the same ever since the storm the Sunday
or two before the fair.

"Q. What direction were you facing? A. North.

"Q. Did you see Mr. Goodwin and his wife and
any other person coming down south on the west side
of the street? A. Yes, sir.

"Q. As they got under or close to the locust tree
what did you notice the man do? A. I noticed him
raise up his hand as though he was reaching for some-
thing, probably a leaf or limb or something, and when
he reached up he came in contact with this wire and
seemed to fight it and push it back and off with his
hand."

Plaintiff testified: "Q. Just describe what hap-
pened. A. We was all laughing and talking and when
we got up just a little south of this little tree he
punched at this girl with his thumb and she started up
on the bank and he stepped his right foot up on the
bank and then he stepped back on the walk and as he
stepped back he just throwed his hands up—

"Q. About how high? A. About as high as his
head.

"Q. Then what did he do? A. The wire seemed
to hang to his hand and he hit at it with his right

hand and his right hand clenched to it and he fell back and then jumped up on his feet and when he jumped up the wire broke in his right hand and he fell backwards with his head on the bank and his feet on the edge of the walk.''

The following quotations are from the evidence of defendant: Ed. Brown testified: ''Q. How high was the wire before you took the limb off? A. The wire was the height of my head or a little higher. Yes, sir, I guess it was, because I had to hold my arms off to get the limb—as I caught hold of the limb with my right hand on the upper part of the limb and my left hand through the brush part and pulled it off of the wire and laid it on the ground.

''Q. What did the wire do when you took this brush off? A. · The wire went up.

''Q. How high did it go up then, Ed? A. I guess it went up the height of six or seven feet.

''Q. How high with reference to your head? A. It was higher than my head so as I could not stand flat footed and reach it. I made myself so well satisfied that it was out of danger I went on.

''Q. Did you continue to pass along there from that time on to the time of this accident? A. Yes, sir, very frequently—often.

''Q. After you took the brush off, state whether or not you ever noticed the wire down any more? A. Well, to my memory, I don't know as I did. I don't know, sir, as I did.''

Joe Crosswhite testified on cross-examination:

''Q. And you say at that time the wire was about six or seven feet high? A. Yes, sir.

''Q. And you took off a small limb? A. Yes, sir.

''Q. You didn't see any difference in the wire, especially after you took the small limb off? A. No. When the wire was down six or seven feet was when the big limb was on there.

"Q.  Did you take the big limb off?  A.  No, sir.

"Q.  Was it on there when you took the little limb off?  A.  It was out in the road then.  When I first noticed the wire with the big limb off it was six or seven feet.  The other limb that I took off was not larger than my wrist.  I was higher when I took that limb off."

Mrs. Wilson Hall testified on direct examination:

"Q.  I will ask you what you saw Mr. Goodwin do to the girl walking with him as they got there by the locust tree.  A.  They seemed to be playing along and just kind of picking at her.  He attracted my attention by doing that.

"Q.  What did the girl do.  A.  She ran upon the side of the bank.

"Q.  State what Mr. Goodwin did?  A.  He stepped up and as he kind of stepped down he kind of jumped up and took hold of the wire.  I didn't see the wire then but I saw the wire when it dangled and broke in two.

"Q.  Did you see Mr. Goodwin in the air?  A. Yes, sir.

"Q.  What did he do?  A.  He fell and Mrs. Goodwin said, 'Oh, Jim, why did you jump and take the wire?'  She was excited—I was myself.  There were not very many there then but the crowd began to gather."

And on cross-examination, the witness said:

"Q.  Did you notice any limbs hanging down from the tree?  A.  That was what I thought he grabbed at.  He may have jumped up and touched the wire.

"Q.  The limbs were in practically the same position as the wire?  A.  I noticed the wire had tangled because I thought he grabbed for a leaf, but when I saw him fall I asked Mrs. Goodwin if he had any kind of spells."

We have not referred to the evidence most favorable to defendant but only to that which we think tends

to disclose the substantial character of the evidence supporting the contention of plaintiff that the wire was so low as to be within easy reach of a man as tall as her husband, whose height was six feet, and that he did not jump from the terrace to grasp something beyond ordinary reach, but while on the sidewalk where he had a right to be, reached up his hand to the foliage and, unwittingly, struck the wire.

We cannot say, as a matter of law, that the marks on the limbs on which defendant so much relies, conclusively settle the question of the height of the wire. Some of the defendant's own witnesses say that before the lower branches were removed the wire was not over six feet high. While it is true the removal of those branches relieved the wire of the strain they placed on it, we have no right to assume that a loose, sagging wire would have the resiliency claimed by counsel, especially when such presumption would necessitate the rejection of the testimony of a large number of witnesses, most of whom appear to be disinterested and all credible. To our minds, the marks on the limbs did not tell the whole story. There is no inevitable inconsistency between the facts they indicate and the testimony of the witness who is six feet, three inches tall and who testified that the sagging wire was low enough to strike his head if he had permitted it to do so. Physical facts cannot be allowed to utterly destroy the testimony of witnesses except where such testimony is so inconsistent with them that no reasonable mind would believe it. In the consideration of the demurrer to the evidence, we assume that Goodwin was on the sidewalk when he extended his hand to the hanging branches and that he accidentally grasped the wire which was low enough to be within his reach.

Counsel argue that the evidence does not tend to prove that the injury was caused by negligence of defendant but does show that the proximate cause was

the act of Goodwin in grasping the wire. We agree with defendant that "negligence in its technical sense embraces in its definition a failure to discharge a legal duty to the injured person." [Feeback v. Railway, 167 Mo. 206.] And that "to the extent that it (a telephone wire) is perceptibly an inconvenience or danger the maintaining of it is negligence. But the liability for such negligence is measured by the consequence that could reasonably be anticipated to follow from the negligent act." [Strack v. Tel. Co., 216 Mo. 601.]

We find the gravamen of the action pleaded in the petition is the negligent failure of defendant to exercise ordinary care to discover that its wire was slackened and hanging over the sidewalk so low that pedestrians might touch it and that it was in direct contact with a wire carrying a high voltage current and, further, was negligent in not exercising ordinary diligence to repair the defect after defendant actually or constructively discovered its existence.

The pleaded cause being founded on the omission to observe ordinary care, plaintiff must be held to a recovery, if at all, on that issue and defendant's conduct must be measured by the standard selected by plaintiff. Defendant did not transport high currents of electricity on any of its wires and unless vagrant electricity strayed on to them they were harmless to persons coming in contact with them. But defendant knew that high voltage currents were carried over the city on overhead wires and that its telephone wires in many places were in close proximity to such wires. In the construction and maintenance of its leads and lines, defendant was bound to anticipate the likelihood of contacts between its wires and those carrying powerful currents and even ordinary care imposed on defendant the duty of doing all that a reasonably careful and prudent person in its situation would have done to guard its uninsulated wires against the invasion of

foreign currents. This was a continuing duty and the knowledge that instrumentalities for conveying electricity are peculiarly susceptible to injury from electrical or wind storms charged defendant with the duty of anticipating that such storms might cause a short circuit between its wires and others carrying high currents. If it be true, as witnesses for plaintiff testify, that the wire of defendant in controversy, was in direct contact with an electric light wire at the crossing on Park avenue for a period of twelve days, we would hold defendant was guilty in law of negligence in so long permitting its uninsulated wire to serve as a conduit for the grounding of a high voltage current it was not designed nor intended to carry. A current of electricity powerful enough to destroy human life or to inflict serious injury may be likened to a wild beast and defendant had no right negligently to maintain a means for the escape from proper confinement of a thing so dangerous.

It is true the electric light current could not have harmed pedestrians using the sidewalk if defendant's wire had been maintained at an elevation beyond their reach, but that does not alter the conclusion we have just expressed. Telephone wires break or sag down from a variety of causes, and defendant should have anticipated the likelihood that its uninsulated wire, charged with a death-dealing current might, at any time, be brought so low as to endanger the safety of pedestrians. And, further, it appears that for twelve days the wire was within easy reach of passersby. The negligence of allowing it to remain in that position during all that time is apparent and inexcusable, no matter by what standard the act be measured.

Defendant brought death and kept it where the innocent wayfarer had but to extend his hand to receive its sting. So clearly was such conduct negligent that we shall not discuss it further and turn to the question of contributory negligence. Certainly it

could not be argued with any degree of confidence that Goodwin was negligent, either in law or fact if he merely extended his hand to push aside depending branches that obstructed his way, nor is there much better ground for the contention that he was negligent if idly or playfully he reached up to pluck some leaves in easy reach. Who is there who has not done that very thing, time and again? With no reason to anticipate that a vicious enemy lay concealed in those leaves, we can imagine no duty he was under to refrain from picking some of them. If it could be said that he knew the telephone wire was there and purposely grasped it, still we would not hold him negligent in law but would say that such conduct merely presented the issue of contributory negligence as one of fact for the jury to determine. He was not bound in law to anticipate that an uninsulated low current telephone wire was negligently charged with a powerful foreign current that would do him injury if he touched it. We conclude that the demurrer to the evidence was properly overruled.

But we find the cause must be remanded for another trial because of prejudicial error in a ruling of the court on the admission of evidence. To prove that defendant had actual notice of the fact that the wire was too low and was carrying a high current, the witness, J. W. Woods who, it will be remembered, sustained a shock while attempting to remove some of the branches, was interrogated as follows, about a conversation he had that evening with his son-in-law, who was a lineman employed by defendant:

"Q. Do you know Mr. Ed. Betts? A. Yes, sir.

"Q. What does he do? A. Works on the telephone line.

"Q. He is a lineman of this defendant telephone company? A. Yes, sir.

"Q. State whether or not you said anything to

him about the condition and position of this wire. (Objections by defendant, overruled.)

"Q. He is a lineman of the company? A. Yes, sir.

"Q. How long has he been working for the company? A. I don't know. He has been working here since I have been here and I have been here twelve months.

"Q. State whether or not you communicated to him the position and condition of the wire."

(Objections by defendant, overruled by the court.)

"Q. Did you? A. I just, when I come home, at his house, I made remarks about the accident and I happened to, trying to take the limb off the wire, and told him about my hand being shocked.

"Q. Speaking to whom? A. To my daughter and, I suppose, in his presence. I think they were there together."

This conversation occurred on Sunday at the lineman's home and while he was not on duty. And, further, the evidence fails to show that this lineman was in control of the Fifth street line, that he had any authority to do repair work on his own initiative, or that he was under any duty to report "trouble" of which he received information while off duty.

The rule is well settled that knowledge that comes to an agent of a corporation while he is not in the performance of his duties as such agent is not notice to the corporation. [2 Ency of Law and Proc., 1191; Bank v. Schaumburg, 38 Mo. 28; Bank v. Fitze, 76 Mo. App. 356; Kyle v. Gaff, 105 Mo. App. 672; Benton v. Bank, 122 Mo. 332; Bank v. Lovitt, 114 Mo. 519; Strack v. Tel. Co., 216 Mo. 601.] And where knowledge of a fact in which a corporation is interested is imparted to a mere servant his authority to bind the corporation by such knowledge must be shown and will not be implied.

157 App.—39

The cases relied on by plaintiff are easily distinguishable from the case in hand. [Alexandria v. Irish, 44 N. Y. 680; Parker v. Steamboat Co., 109 Mass. 449.] In those cases the notice was given to servants while they were on duty and about the very thing that was engaging their attention. Those cases would be applicable had it appeared that the information of the defect had been given the lineman when he was engaged in repair work on that line, but to hold this conversation admissible would be on a par with saying that notice given to a section hand at his boarding house on Sunday of a defect in the railroad track in his section would be notice to the company. Considering the conflict in the evidence respecting the vital issues of fact, the error could not be otherwise than harmful.

The judgment is reversed and the cause remanded. All concur.