CLARENCE CAMPBELL, JR., by CLARENCE CAMPBELL, his Next Friend, v. UNITED RAILWAYS COMPANY.

**Division One, May 31, 1912.**

1. **NEGLIGENCE: Electric Wires: Maintained in Public Place: Degree of Care.** It is the province of those maintaining in a public position electric wires which may become dangerously charged, to consider that danger, and, if it exists, to use every protection reasonably accessible to prevent it and the utmost care to keep such wires in a safe condition. Any neglect of these precautions is such negligence as will render the one so negligent liable in damages for personal injuries directly resulting therefrom.

2. ————: **Definition.** Negligence is the failure to exercise the degree of care which prudence requires under the circumstances of each particular case.

3. ————: **Electric Wires: Maintained in Highway: Prima Facie Case.** The defendant maintained within a public highway an electrical construction consisting of a strain and a pull-off wire running from a charged trolley wire to a post, and a guy wire which touched those wires upon the post and ran to another post standing three feet from the ground. A circuit breaker was inserted in the strain wire which, when in order, prevented the passing of current from the trolley wire, but this circuit breaker could be rendered ineffective by lightning, and the defendant maintained no system of inspection. Finally, a small wire had been attached by a neighboring landowner to the guy post, touching the guy wire, and this small wire ran for a short distance beside a cinder path along the highway. The plaintiff was injured by an electrical current received by touching the small wire beside the cinder path. *Held*, that

these facts constitute prima facie evidence of the negligence of defendant, that the injury to the plaintiff resulted from such negligence, and that in the absence of evidence tending to rebut the presumption so raised the plaintiff was in law entitled to a verdict.

4. ——: **Verdict: Grounds of Revision by Appellate Court.** In cases where there are elements of damage not susceptible of mathematical reduction to terms of money, the amount is, to a greater or less extent, a matter of opinion, founded upon the facts in evidence and such inferences as may be legitimately drawn therefrom. Whether or not the fact tends to support the inference is, in proper circumstances, a question of law, and it is upon some such grounds that appellate courts have reserved to themselves the power to judicially declare that the jury has exceeded its limit, and to refuse to sustain its action.

5. ——: ——: **Excessive.** Where the plaintiff was, when injured, a healthy boy twelve years old, and by the injury from an electric current he lost his hand, his growth had, at the time of the trial, stopped for fifteen months, some of his teeth had fallen out and the enamel had been destroyed while the gums had receded, his ears as well as his speech were affected, he had grown timid and nervous and his ability to learn had been impaired, four surgical operations had been performed, the suffering was intense and his physician said that, while he seemed to be improving at the time of the trial, it was pretty hard to say whether he would recover, it is *held* that a verdict for $20,000 was too large by $10,000.

Appeal from St. Charles Circuit Court.—*Hon. J. D. Barnett*, Judge.

Affirmed (*conditionally*).

*T. E. Francis, Boyle & Priest* and *T. C. Bruere* for appellant.

(1) The court erred in refusing to direct a verdict, for the reason that plaintiff's evidence and the undisputed and indisputable physical facts established that the insulation in the wires was performing its functions perfectly until within a few minutes before plaintiff was injured, and appellant was not shown to have been guilty of negligence thereafter. Strack v. Tel. Co., 216 Mo. 601; Clonts v. Gas Co., 144 Mo. App.

582; Brown v. Light Co., 137 Mo. App. 718. The Von Treba (209 Mo. 648), Geismann (173 Mo. 654) and Gannon (145 Mo. 502) cases are distinguishable from the case at bar in that: (a) The wire causing the injury here was not owned by defendant nor possessed or controlled by it; hence the *res ipsa loquitur* doctrine does not apply. Thompson on Negligence, sec. 7635; Scott v. Dock Co., 3 Hurl. & C. 596; 29 Cyc. 592; McNamara v. Railroad, 202 Mass. 491. (b) The pleader here specified the particular defect complained of and hence could not recover under a presumption of general negligence. Waldhier v. Railroad, 71 Mo. 514; Roscoe v. Railroad, 202 Mo. 587; Beane v. Transit Co., 212 Mo. 352. (c) The facts showing appellant was not negligent, and which would rebut a presumption of negligence, were it a proper case it indulge in such presumption, were developed in plaintiff's case, thus making it the duty of the court to declare the effect of such facts as a matter of law. (2) The verdict is so grossly excessive as to be indicative of bias and prejudice on the part of the jury against appellant. Brady v. Railroad, 206 Mo. 509; Phippin v. Railroad, 196 Mo. 321; Stolzie v. Transit Co., 188 Mo. 580; Devoy v. Transit Co., 192 Mo. 197; Dean v. Railroad, 229 Mo. 425.

*Randolph Laughlin* and *J. B. Garber* for respondent.

(1) (a) Appellant's duty to abate the Hogg wire, arose, not at that barren and belated moment when it knew that said wire had become actually charged with electricity, but in the more ancient and auspicious epoch when it knew (or by the exercise of ordinary care would have known) that said wire was in a potentially dangerous situation, and was apt to become charged with electricity at any time. Brubaker v. Light Co., 130 Mo. App. 449; Brown v. Light Co., 137 Mo. App. 734; Harrison v. Light Co., 195 Mo. 631. (b)

This being the law, and respondent having specifically pleaded and proved a charge of negligence in accordance with this doctrine, appellant's points 1-a and 1-b are mere academic questions, whose decision is not necessary to the decision of this case.  (2)  (a) If the verdict were excessive, it would be cured, not by reversal and remandment, but by remittitur.   Moore v. Transit Co., 226 Mo. 707; Clifton v. Railroad, 232 Mo. 708; Cook v. Printing Co., 227 Mo. 471.   (b)  But the verdict is not excessive.   Brady v. Railroad, 206 Mo. 509; Phippin v. Railroad, 196 Mo. 321; Stolze v. Transit Co., 188 Mo. 580; Devoy v. Transit Co., 192 Mo. 197; Dean v. Railroad, 229 Mo. 425; Waldhier v. Railroad, 87 Mo. 37; Markey v. Railroad, 185 Mo. 348; Reynolds v. Transit Co., 189 Mo. 408; Rodney v. Railroad, 127 Mo. 676; Hollenbeck v. Railroad, 141 Mo. 112; Clark v. Railroad, 234 Mo. 434.   (c) The evidence of the extent of respondent's injuries is uncontradicted, and should be taken as true, and considered with the law in view which makes the jury, in the first instance, and the trial judge, in the second instance, the judge of the amount of the recovery.   Clark v. Railroad, 234 Mo. 428; Dean v. Railroad, 229 Mo. 425. (d)  We think that it should also be considered with the fact in view that living is more than twice as expensive now as it was when the early precedents were established; that it costs more than twice as much to keep an invalid now as it did then; and that the court should keep abreast of the times, and should administer justice with regard to the extrinsic conditions, as well as the intrinsic injuries, of the victim.

BROWN, C.—This suit was instituted in the circuit court for St. Louis county November 15, 1907, and was thence removed to the circuit court for St. Charles county, where it was tried September 14-18, 1908.   Its object is to obtain damages for personal injuries sustained by the infant plaintiff by coming in contact

with an electric wire through the alleged negligence of the defendant. The plaintiff was at the time of the injury twelve years old. The defendant operated a line of electric railway extending from the western limits of the city of St. Louis to Creve Coeur Lake in St. Louis county, a distance of about thirteen miles. Electricity for the operation of its cars was transmitted in direct currents from its transforming stations at each end of the line by a system of overhead construction consisting of feed and trolley wires suspended on poles. The direct transmission to the propelling motors of the car was from a trolley wire suspended as nearly as practicable over the center line of each of the two tracks of the double track road. These wires were of copper, three-eighths of an inch in diameter, and entirely naked, so as to admit of the continuous contact of the trolley attached to the car, and carried an electrical current of 550 volts of electromotive force.

At a point approximately in the middle of its line the road crosses, upon a curve convex to the north, a travelled highway known as the Walton Road. At this point the trolley wires were supported and held in position by the following construction: Two poles sunk in the ground opposite each other on either side of the road, the one on the outside of the curve being so planted as to lean slightly from the track. Opposite to the outside of this, and about four feet further away from the track, a post was sunk and firmly anchored in the ground, extending about three feet above its surface. A large wire called a guy wire was then wrapped around the pole near its top, stretched tightly and wrapped around the top of the post, which was called a guy post. The poles so secured were supposed to have the strength necessary to resist the tensile strain of the wire construction between them. A wire was then stretched between the tops of the two poles,

243 Sup.—10

and firmly fastened at each end by wrapping around them.  This cross wire seems to be known as a ''span wire,'' and at a point above the center of each track its structure consists of a short sickle shaped piece of metal with the opening beneath, the function of which is to suspend the trolley wire.  The poles along the north side of the railroad are numbered consecutively, the one in the east side of the Walton Road, where this accident occurred, being numbered 258.  It seems to be practically conceded that this post stood within the limits of the road, in which, along the same side, at various distances from but always near to the highway limit, ran a cinder path which answered the purposes, of a sidewalk.

North of the guy post which we have described and extending from the Walton Road east about three hundred feet was a tract of land about twenty feet wide. This was bounded on the south by the defendant's right of way, and on the north by the lot of Mr. George R. Hogg, which was fenced along the south side by a woven wire fence supported by cedar posts, and upon which Mr. Hogg resided.  This strip had, years before, been dedicated as a public highway known as Midland Boulevard, but as that portion of the street had been practically destroyed by a railway cut just east of the Hogg premises its use had been abandoned, and Mr. Hogg determined to render it less unsightly by plowing it up and seeding it in grass; which he proceeded to do, and in April, 1907, for the purpose of keeping stray stock from the premises, he attached an ordinary wire clothes line to the defendant's guy wire near the top of the guy post, and stretched it to the corner of his own fence to which he fastened it, supporting the middle upon an ordinary broom stick. Whether this was in contact with the metal portion of Mr. Hogg's fence, or was only wrapped around the cedar post at the corner, does not clearly appear.

There is some evidence that another wire called the "pull-off wire" was attached to the pole standing in the Walton Road and extended thence to the trolley wire over the north track at some point between that pole and the next one to the west, for the purpose of pulling the trolley wire to a position over the center of the track at that point, but it is admitted that either this wire or the "span wire" was wrapped around the pole in contact with the upper end of the guy wire which was intended to keep the pole in position against a strain which had been sufficient to pull up the guy post with its anchor.

So far as above described the situation was that the trolley wire charged with 550 volts of electric force was in perfect contact with a wire of equal, or at least of great, conductivity, wrapped around the top of the pole; that wrapped in contact with this was another wire called the guy wire which passed down to the post set in the ground, and in perfect contact with this was the Hogg wire which extended to Mr. Hogg's fence, so that if the Hogg wire should be grounded, or placed in contact with the moist earth, there would be a perfect metallic circuit from the power house of the defendant where the electricity was generated, through the Hogg wire to the earth which afforded the means of restoring the electrical equilibrium, so that the ordinarily innocent clothes line would have become an instrument of great danger. It appears in the evidence that the wooden members of this construction were, of themselves, non-conductors of electricity, while water, like the iron and copper of the wires, is a conductor; so that when the wood becomes saturated with water it becomes a conductor through the property of the water which fills its cellular structure. Water adhering to or running along the surface of the wood will also conduct the electric current. It also appears that the same phenomenon exists in case of the earth; so that a wire charged with an electric current of high

tension, grounded by coming in contact with the saturated earth, will, with the heat developed at the point of contact, frequently dry the earth, and insulate itself by the condition it creates.

The testimony also shows that to modify the obvious danger of such situations as we have described, the defendant used appliances called circuit breakers, for the purpose of insulating, or electrically isolating, that portion of its system of wires which must necessarily remain charged, from those wires which, like the guy wire and the Hogg wire, ought not to be charged at all. These circuit breakers consisted of two strong iron hooks contained in a ball of mica, a brittle material, easily crumbled. In the manufacture of this appliance, two of these hooks are placed in such a position that their longitudinal axes correspond, and the hooked ends, in other respects ready to engage, remain separated by about one-eighth of an inch of space at the points nearest to contact, and the ball of mica is then constructed around them, perfectly filling the spaces which separate the iron surfaces of the hooks. Upon the shank of each hook, which extends beyond the mica ball, is forged an eye through which the wire is bent and tied in place, so that the circuit breaker constitutes a section of the continuous wire, one end of it being charged with a current of electricity which cannot pass the thin film of mica which separates the conducting surfaces of the iron hooks. The evidence tends to show that one of these, either in the span wire or the pull-off wire, constituted the only impediment to the passage of the current with which the cars were operated, directly into this Hogg wire.

These circuit breakers frequently become worthless by the fusing of the mica which frequently happens from the effect of lightning, or from some other cause that permits the surfaces of the hooks to come in contact, so that the appliance becomes a conductor instead of a non-conductor of electricity, and they were

sometimes left in place when known to be worthless. When they were found fused it was attributed to lightning; the statement having been made by one of defendant's witnesses that these thirteen miles of wire would exercise an attractive influence upon that class of electric discharge for a quarter of a mile on each side of the line. The evidence shows that such guy wires are sometimes protected by wooden casings, so that the naked wires are not easily accessible.

On the afternoon of the accident plaintiff's mother had been shopping in St. Louis and was expected home over defendant's line about six o'clock. It had been raining since about four o'clock, and was still raining, when three of her children went down the Walton Road to meet the car and take her an umbrella. Joe, aged eleven, and Nellie, aged eight, started first, barefooted, walking in the mud in the middle of the road. Clarence, who was then twelve years old, and was wearing shoes, went down the cinder sidewalk. He suggested a race, and Joe and Nellie ran on ahead. When they got to the tracks they looked around and saw Clarence lying on his face on the cinder walk, with fire coming from his hands and feet. The Hogg wire had burned off near the fence, and fallen upon or near the path. The plaintiff had, in some way, come in contact with it, and it is not denied that his injuries were produced by the electrical current of defendant passing from its trolley wire through either the span wire or the pull-off wire, and thence through the guy wire and Hogg wire into his body. The character of his injuries were serious, and the evidence relating to them will be further mentioned in the opinion.

Mr. W. D. Burton, "trouble man" in the employment of defendant, testified for it that he went to the scene of the accident the next morning. He said: "I saw the pull-off wire and back guy wire in contact, and knew where my electricity got out." The petition specifically charges negligence in the following

particulars: (1) In wrapping the guy wire upon the pole in contact with the wire supporting the trolley wire, and maintaining such negligent construction. (2) In not properly insulating the trolley wire so as to prevent the electrical current from passing therefrom into the supporting wire. (3) In not properly insulating the supporting wire so as to prevent the electric current from passing into it from the trolley wire, and therefrom into the guy wire. (4) In not properly insulating the guy wire, so as to prevent the electrical current from passing therefrom into the Hogg wire, and so as to prevent the electric current from passing into the lower portion of said wire at all. (5) In not properly inspecting and maintaining the insulation of said wires, and each of them, so as to prevent them from becoming dangerous to persons lawfully passing on and along the Walton Road. (6) In permitting the Hogg wire to be and remain attached to the guy wire for many weeks prior to said June 24, 1907, during all of which time the defendant, by its officers, agents and servants, well knew, or by the exercise of ordinary care would have known that the guy wire was in a dangerous and defective condition, and was in a position well calculated to impart its said danger to the Hogg wire, and in not compelling the abatement and removal of said Hogg wire, and in not taking steps to prevent its electric current from passing into said Hogg wire, which it well knew, or by the exercise of a high degree of care would have known, it was apt to do.

The defendant assigns error on the refusal of the court to direct a verdict for it; also its action with reference to certain other instructions asked by the respective parties.

I.    The first error assigned by defendant is upon the refusal of the court to direct a verdict in its favor, on the ground, in substance, that the evidence es-

Campbell v. United Railways.

tablishes absolutely and indisputably the fact that its wires were properly insulated, and safely performing their functions, until a few minutes before the plaintiff was injured, and that the defendant is not shown to have been guilty of negligence thereafter. Upon this assignment it is necessary to briefly refer to the facts, as well as to the law applicable to them.

Electricity is, perhaps, the most insidious as well as the most destructive of the natural forces of which we are cognizant and have availed ourselves in the interest of the civilization of this age. It is insidious because it only manifests itself in the exercise of its destructive force. It is hidden from all the senses which constitute human apprehension until it strikes, and then its blow is so deadly that in many jurisdictions it has been selected by law as the surest and quickest, and therefore the most painless instrument available for the destruction of human life in case of judicial executions. What it is, is simply a matter of speculation, for no one has ever seen it. It has been called a fluid, a form of radiation, an induced condition, and perhaps many other things, each of which is as far from expressing a true comprehension of its constitution as the others. All we know of it is that experts in the science have found certain phenomena following certain conditions, and have applied them to many useful purposes in the arts and industries; but our knowledge of the subject is still so limited that we must rely on these experts for information as to the conditions which mean life or death to those who come in contact with them. In this case an innocent looking clothes line, in a place where the public had the right to be, and where children as well as adults were likely to come in contact with it, was the destructive agent so far as any agency was visible. It drew its baleful energy from an equally innocent looking guy wire, placed in a similarly dangerous relation to those rightfully enjoying the use of the public road.

There was nothing in the appearance of either to indicate danger, and the fact that they were so placed was an assertion on the part of those who had so placed them that they were harmless.  The guy wire was placed in this public position by those whose calling required that they should be experts in electrical science, and upon whose skill and prudence the public must largely depend for protection.  It was their province to consider, in the interest of safety, the danger that this wire might become highly charged with electricity and, if such danger existed, to use every protection reasonably accessible to prevent it, and the utmost care to keep them in such safe condition.  [Geismann v. Missouri-Edison Electric Co., 173 Mo. 678; Von Trebra v. Gaslight Co., 209 Mo. 659.]  Any neglect of these precautions is such negligence as will render the one so negligent liable in damages for personal injuries directly resulting therefrom.

Negligence is the failure to exercise the degree of care which prudence requires under the circumstance of each particular case.  In this case a trolley wire, charged with a deadly current of electricity, was stretched over the center of one of defendant's railway tracks opposite the place of the accident.  This was in contact with a strain wire, running across both tracks, and fastened in place by being wrapped around the top of a post on each side of its railroad.  One of these posts, being on the outside of the curvature, was, in consequence of the tendency of the trolley wire to assume a straight position, subjected to greater strain than the opposite one and was consequently strengthened by a post sunk in the ground three or four feet behind it and firmly anchored and extending about three feet above the surface of the earth, from which another wire, wrapped around its top, was stretched to the top of the pole and there wrapped in contact with either the span wire, or another wire called a pull-off, wrapped around the top of the same pole, and extend-

ing to the trolley wire to hold it laterally in position. Which of these two wires was involved in this connection, and carried the offending current in this case is, under the pleadings and evidence, immaterial.

Wood, of which the pole and post were constructed, is a non-conductor of electricity; so that, had the guy wire become charged, it would not have discharged itself into the ground, being insulated by the wood of the post. The earth is also, when perfectly dry, a non-conductor, or at least very imperfect conductor of electricity, so that it would have been possible for a person standing on the dry earth to have held the guy wire in his hand without serious results. Were the earth moist, however, such a position would likely have been fatal. The only thing intended to prevent the charging of the guy wire was an insulator called a current breaker, the distinguishing characteristic of which was the insertion in the strain wire, subject to all the strain of that wire, a ball of mica containing two hooks, separated by about one-eighth of an inch of mica, which was subject to a pressure equal to the strain upon the wire, and which, if crumbled, would permit the hooks to come together and make a perfect conductor of the instrument. It was not only subject to all the longitudinal strain of the wire in which it was inserted, but also to the lateral pressure of the wind, and the shaking incident to the passage of the trolley along the trolley wire. They were also subject to be fused by lightning, and it was stated by one of defendant's expert witnesses that the wires of the thirteen miles of road had an attractive influence for such electrical discharges extending a quarter of a mile on each side. Although there was some evidence that another one of these instruments was placed in the guy wire, it was not important and would have no bearing upon the question of the negligence of defendant in maintaining the structures just described. The situation was that the defendant had placed in the

public road an instrument with which children and others were liable, in the exercise of their right to use that thoroughfare, to come in contact, and that it was, under some circumstances, liable to be charged with a dangerous current of electricity is demonstrated by the circumstances of this case. That it was the duty of the defendant to use every reasonable means available to prevent injury therefrom we have already seen to be the settled doctrine of this court. To meet this requirement of common prudence it adopted a device, the protecting material of which was easily crumbled, as was shown by experiment in court, and was necessarily subjected to frequent movement under great strain; which was subject to destruction by lightning even in such moderate atmospheric disturbances as the one that took place on the afternoon of the accident, without leaving any visible indication of its inefficiency; and was constantly liable to become useless without any alteration in its external appearance. Instead of the constant anxiety which such a condition would naturally excite, the evidence discloses no system of inspection calculated to disclose defects in this insulation, and it affirmatively appears in the evidence of the defendant that instead of controlling their use by a system of expert supervision, the boss of any one of the many working gangs of the company had the right to determine whether they should be taken out after having become useless without substituting anything to fill the vacancy. It may be that these appliances constitute the most perfect means known in electrical construction to insulate one end of a metallic member from the other end charged with electricity, but if this is true the evidence of the defendant amply shows that care should be used in its maintenance, and to prevent the flow of fatal results from its failure to work. How this was done is illustrated by the testimony of Mr. Barton, an expert employee of defendant whose duty it was to go to the place of the

accident and ascertain what was the matter. He tells in his testimony what he saw when he got there in the following words: *"I saw the pull-off wire and back guy wire in contact, and knew where my electricity got out."* His company had chosen that the safety of the public which had furnished it the place to plant its pole and strain its guy wire should depend upon the working of an instrument which it admits to be unreliable, when it could have broken the circuit simply by wrapping the two wires that constitute it in separate positions upon the pole. There is ample testimony that the construction adopted was negligent, and the thing speaks for itself.

The company having chosen to make a continuous circuit from the current of their trolley wire to the attachment of the Hogg wire, only broken by the one or two insulating devices we have described, had created a situation that they were bound to protect against the consequences of its weakness, and the omission of any step necessary to such protection is negligence by virtue of the situation which creates the necessity. The offending guy wire being left naked by the defendant it occurred to Mr. Hogg as a matter of convenience or economy to use it as a portion of his fence. He accordingly attached his piece of clothes line to it in such a way as to form a perfect contact between the two, fastening the other end to his own fence some twenty feet away. This added another element to the danger created by the railway company, by extending its zone about twenty feet along the traveled road. The defendant chose to let it remain in this condition for about two months, a time sufficient to justify us in assuming as a matter of law that by the exercise of the care which the law imposes under the circumstances it would have become aware of this change, thereby assuming the duty of exercising care appropriate to and commensurate with such new condition. It could, however, have detached the Hogg wire,

or could have prevented any contact with its guy wire by casing the latter with wood to a sufficient height, which the evidence shows is sometimes done; but having neglected all such precautions it became responsible for the condition it had permitted.

Mr. Hogg's fence was constructed of woven wire supported by cedar posts. The evidence is not clear as to whether the wire which came in contact .with the plaintiff had been fastened to one of these posts or to the wire structure, or as to whether it had been originally in contact with the wire at all, or as to whether the wire of the fence had been grounded in moist earth up to the date of the accident, so that it is by no means certain that its grounding on that day was not the result of the water which fell in considerable quantities rather than of the action of the lightning. The evidence that the wires were struck by lightning on that date consisted of the statement that the mica must have been fused because it was not performing its office; the statement that thunder was heard at the office of the United States Weather Bureau in the city of St. Louis on that afternoon; and the statement of one of the defendant's conductors that he saw some lightning of the dingle-dangle kind the same afternoon, but that he did not know whether there was any thunder or not. It is not important, however, to consider this question for the case was tried by defendant upon the theory that lightning even of this kind is dangerous to its insulators, and it is therefore one of those incidents which it was the duty of defendant to take into consideration in the interest of public safety.

There being no question in this case that the electric current which injured the plaintiff proceeded from a naked wire maintained by the defendant in or upon the line of the public highway, which wire was, at the time, connected electrically with a trolley wire with the current from which its cars were operated, we hold that these facts constitute prima facie evidence

of the negligence of the defendant, that the injury to
the plaintiff resulted from such negligence, and that
in the absence of evidence tending to rebut the pre-
sumption so raised the plaintiff was in law entitled to
a verdict. The evidence being clear and undisputed
that notwithstanding the use of the instruments called
circuit breakers, the defendant's guy wire was sub-
ject, by the action of lightning under ordinary circum-
stances, or otherwise, to become dangerously charged
with electricity, it was its duty to use such other means
of protection as were reasonably accessible; that in
wrapping its pull-off or strain wire in contact with the
guy wire by means of which contact the guy wire was
charged, and by failing to insulate the same by wooden
or other non-conducting casing to a proper height, the
defendant failed in the performance of that duty, and
has, for that reason, not only failed to meet, but has
strengthened, the prima facie case against it. The
fact that the Hogg wire intervened, so that the current
it carried by reason of the negligence of the defendant
was the instrument of the injury, has no tendency to re-
lieve the defendant from liability for its own wrongful
act. Under these circumstances it is unnecessary to
refer to the questions made by the defendant in his
assignment of errors and brief upon the giving and
refusal of instructions upon the question of the right
of the plaintiff to recover.

We have carefully examined the case of Strack v.
Telephone Co., 216 Mo. 601, upon which the defendant
seems greatly to rely, and see nothing in it which con-
flicts in the slighest degree with the views we have here
expressed. In that case the question was whether or
not the defendants had been guilty of negligence in
maintaining an unused telephone wire, distant, hori-
zontally, fifteen feet from the trolley wire of the street
railway. By a severe storm the telephone wire had
been broken and thrown across the trolley wire. This
court very properly held in that case that there was

nothing in the situation of these wires before the storm to indicate danger to the public. Had the telephone wire been wrapped around the trolley wire a question would have been presented calling, in all probability, for a different result.

II. The real question in this case is whether the jury overstepped the boundaries of its province with respect to the amount of the verdict. No one will deny that it is exclusively within the province of the jury to pass upon questions of fact presented by the evidence, including the assessment of damages in cases where they are not liquidated by law. There are, however, many elements of damage not susceptible of mathematical reduction to terms of money. In such cases the amount of the resulting damage is, to a greater or less extent, a matter of opinion, founded upon the facts in evidence, and such inferences as may be legitimately drawn therefrom. Whether or not the fact tends to support the inference is, in proper circumstances, a question of law; and it is upon some such ground that appellate courts have reserved to themselves the power to judicially declare, in such cases, that the jury has exceeded its limit, however dim and shadowy it may be, and to refuse to sustain its action.

The facts in evidence affecting the amount of this verdict are substantially as follows: At the time of the accident, on June 24, 1907, the plaintiff was a "husky" youngster about twelve years old who could plow, drive horses, ride after hounds and had given no evidence of timidity in work or sport. His injury was such as might be inflicted by the passage of a current of electricty through his body from his hand to his foot. Its entry at his hand developed so much heat as to incinerate the flesh and destroy the member. It departed from his body at his feet with similar evidence of heat disturbances. So far as visible effect on the tissues is concerned, the phenomena attending its

course through the body is a mystery.   The trial took
place about fifteen months after the injury.   Although
he was at a vigorous age, his growth had stopped dur-
ing the time intervening between the accident and the
trial.   Some of his teeth had fallen out, and the enamel
and enveloping membranes of their roots had been
destroyed and his gums had receded, so that the roots
of some of them were exposed.   His ears were affected
so that they gave him pain, and the tissues of the
drums had relaxed so that they had become externally
concave.   His speech was affected.   He was timid and
very nervous.   His power to learn had been impaired
so that although he had been able to do as much of the
work at school as any of the other boys, he had become
nervous and fidgity, so that he could not apply himself
to his books.   He would study at times and then again
was so nervous that it seemed as if he couldn't study.
His physician described him as biting his fingers all the
time as he came down on the cars to the trial.    All
these things were attributed by the doctor to low vital-
ity resulting from the accident.   His family physician
said:   ''Some people, it depends on their age, will re-
cover, as years go on, and he might have a strain or
something he wouldn't recover; its pretty hard to say.''
He was, in the opinion of the doctor, inproving at the
time of the trial.   Within two months immediately suc-
ceeding the accident there were four surgical opera-
tions performed on him including one by which a finger
had been saved by grafting skin taken from his thigh.
His suffering was intense.

The jury, in assessing the damages sustained by
the plaintiff, no doubt took into consideration the fact
of the loss of his hand, not only in an industrial sense,
but with respect to its inconvenience in all the other
relations of his life.  They not only considered his acute
physical suffering, but also the mental suffering that
would probably result from both the disability and de-
formity; interference with his education already suf-

fered, and which he would probably continue to suffer for. an indefinite time in the future; and the uncertainty as to whether or not the vitality and vigor of mind and body which had before characterized him, and must stand behind all his efforts, would ever be restored. They were undoubtedly influenced more or less by the idea that the wrongdoer should not have the right to set a value on a healthy, intelligent American lad founded upon the efficiency he might probably attain with a pick and shovel. We think the jury had the right to determine this question from the standpoint we have stated. The defendant has seen fit to leave the statements we have referred to unquestioned, and, although sharply contesting the case, and being, no doubt, as in duty bound, in close touch with matters connected with the effect of its own motive power upon the constitutions of its victims, it has chosen to leave the prognosis of the plaintiff's witnesses unquestioned. It only remains for us to determine whether these unquestioned facts, including the inferences which the jury might lawfully draw from them, tend fairly to support the verdict.

Considering this question as an original one in this court, we would be slow to hold that, within the limits of this verdict, we might lawfully substitute our own opinion for the unanimous opinion of the twelve men who tried the issue, whose peculiar province it was to determine such questions, and who had before them evidence which might aid us in the consideration of the same question, in the person of the boy himself. In the interest, however, of that uniformity and certainty without which legal process would become a game of chance in which our rights would be the stakes, we must defer to the course of this court so far as it tends to establish a consistent rule of adjudication.

We have not hesitated, whenever the interests of justice have seemed to require it, to exercise a revising control over the amount of the verdict in cases of

this character, and it has long been our practice to enforce that control, in proper cases, by requiring a remittitur as a condition of the affirmance of the judgment.    Thus, in Waldhier v. Railroad, 87 Mo. 37, the amount of the recovery was so reduced from $25,000 to $20,000 for loss of both legs below the knee.  In Markey v. Railroad, 185 Mo. 348, the recovery for a similar injury was so reduced from $35,000 to $20,000; this court in ordering the remittitur saying: "Thirty-five thousand dollars is a larger award than  .  .  .  this court has ever approved.  We prefer to adhere to the conservative course that our courts and juries have pursued in the past. . If the jury had awarded the plaintiff $20,000 damages the verdict would have met our approval, but we are not satisfied that it would be just to affirm the judgment for the amount assessed."   In Stolze v. Transit Co., 188 Mo. 581, a similar reduction was made from $15,000 to $8,000 on account of the breaking of both legs.  In Phippin v. Railroad, 196 Mo. 321, a like reduction was made from $12,000 to $9,000 on account of the ruin of a hand, all of which was cut away except the thumb.  In Brady v. Railroad, 206 Mo. 509, $15,000 was held to be too much, and a reduction to $10,000 exacted on account of the loss of a foot.

In Partello v. Railroad, 217 Mo. 645, the plaintiff was the wife of Major Partello, the military commandant at Fort Reno, and had been accustomed, by virtue of that position, to take a leading part in the social functions at the Fort, was fond of doing her own house work, walking, and riding on horseback, and had the appearance of a strong and vigorous woman.  The evidence tended strongly to show that the accident left her a helpless and incurable nervous wreck.  It was said in the opinion, none of her bones were broken, and no joint dislocated or injured and there was no apparent disfigurement save a slight mark on the nose.

The jury returned a verdict for thirty thousand dollars, from which she voluntarily remitted ten thousand dollars at the hearing of the motion for a new trial. The amount still remaining was held to be excessive and the judgment was accordingly reversed by this court. In Chlanda v. Transit Co., 213 Mo. 244, the plaintiff, who, just before her injury, was said by a physician who then examined her for insurance to have been "a picture of health" and "sound in all particulars," was injured December 6, 1901. The same physician who had examined her for insurance afterward examined her at intervals up to about July 26, 1903, and characterized her condition as that of a physical wreck. It stood "conceded that there were no broken bones." The verdict was for eighteen thousand dollars, and an order granting a new trial was sustained by this court, which said: "We are of opinion the order granting a new trial may be sustained on the theory of an excessive verdict somewhat attributable to such overwrought sympathy on the part of the jury as amounts (in legal effect) to prejudice and passion."

In Magrane v. Railway, 183 Mo. 119, this control was exercised in a case where improper elements of damage had been submitted to the jury and were presumably included, with proper elements, in their verdict; this court forcing a remittitur to cure the error. This was expressly approved and followed in Moore v. Transit Co., 226 Mo. 689, the court through Fox, J., saying: "to the end that no injustice be done the defendant, we are inclined to require a substantial remittitur in such amount as in our opinion will fully meet the excess in the verdict by reason of any consideration which may have been given to the objectionable testimony by the plaintiff."

In Clark v. Railroad, 234 Mo. 396, the opinion describes the condition of the plaintiff, injured by coming in contact with an electric wire, as follows: "He is

horribly maimed and hopelessly crippled for life, and incapacitated from performing all manner of labor, not even able to feed himself.'' The court, speaking through Judge Woodson, said: ''The verdict was for $20,000 and *for that reason* should be closely scrutinized.'' It was sustained.

In Cook v. Globe Printing Company (a case in which no bones were broken), 227 Mo. 471, the court seemed to disregard the twenty thousand dollar dead line, and itself laid the damages which plaintiff ought to recover at fifty thousand dollars; twenty-five thousand of which were specially assessed as compensatory. This does not indicate that, in the opinion of this court, the plaintiff in that case would have preferred the loss of a leg or arm or both, or the wrecking of his nervous system, to the publication of the article which was the subject of the controversy, but is more in the nature of a tribute to reputation in the abstract. It gave practical voice to the reflection of Iago: ''Good name in man and woman, dear my lord, is the immediate jewel of their souls.'' In doing so it is barely possible that we may not have had vividly in mind another remark of the same sage to his friend Lieutenant Cassio, who complained that he had lost the immortal part of himself—his reputation. Iago wisely consoled him thus: ''As I am an honest man, I thought you had received some bodily wound; there is more sense in that than in reputation. Reputation is an idle and most false imposition; oft got without merit, and lost without deserving: you have lost no reputation at all unless you repute yourself such a loser.''

We have cited the foregoing cases, not for the purpose of sustaining or showing the power of this court to control the amount of the verdict, but for such hints as they contain as authorities affecting its amount. Although selected for that purpose they are far from satisfactory, not only because each case is necessarily in many respects *sui generis,* but because juries and

even judges must necessarily have and exercise some latitude with reference to personal opinion, although the principles of law are constant.

After careful consideration we have concluded that the judgment (which is for twenty thousand dollars) should be affirmed to the extent of ten thousand, if the plaintiff within ten days after the publication of this opinion enter a *remittitur* in the amount of ten thousand dollars, as of the date of the rendition of the judgment below, and it is so ordered. Otherwise the judgment will be reversed and the cause remanded for a new trial.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur except *Valliant, J.,* absent.